Case number 14-2537. The United States of America v. John Chambers. All arguments not to exceed 15 minutes per side. Mr. Desai for the defendant appellant. Good morning, your honors. May it please the court. Michael Desi, I'm appearing on behalf of my client, John Chambers. Your honors, I would like to reserve five minutes for rebuttal if I may. May. Thank you. Your honors, we're here on a very straightforward issue. This is a motion to suppress the appeal of the denial of a motion to suppress evidence in a case in which my client was charged and eventually convicted at jury trial of felon in possession. Now, I want to talk specifically about the district court's opinion denying the motion to suppress. The district court made a finding of fact which is clearly erroneous, and I understand that generally the court may hear lawyers say that often and then they might argue about why it's clearly erroneous. However, in this case, it's demonstrably erroneous. It's demonstrably disproven by the police reports. Is demonstrably erroneous higher than clearly erroneous? I think it is, your honor. I think demonstrably is better than clearly in this case because we can put our fingers on the police report and we can see it. And this is why I want to focus on this particular finding. It's the underpinning of the district court's denial of the motion to suppress. The district court found that the arresting officers received a radio conveyance from the officer who first arrived on the scene, which was supposedly Officer Hoffman. And according to the district court, because Officer Hoffman was the first one on the scene, or excuse me, Deputy Miller was the first one on the scene, according to the district court's opinion, Deputy Miller conveyed a radio dispatch and he described two individuals and that was the basis of the arresting officers' grounds for the Terry stop. Well, that didn't happen and the police reports reflect that that didn't happen. Now, the district court specifically said in its finding that the police reports showed that. So I want to make clear I'm relying on the district court's citation to the police reports. The police reports showed that Officer Miller arrived after the arresting officers. Officer Miller denied that he made that radio transmission. He had no recollection of it. And just to be clear, the district judge queried Officer Miller because this was the crucial issue in the case of whether there was this radio transmission because without it, there's no basis for the Terry stop. Now, why is that? Because the officers, the two officers who did arrive and have the interaction, they saw essentially what Miller had told them or allegedly told them. That is, two men, one with a bandana, in this vicinity. I mean, Miller wasn't the only one that knew that shots had been fired, right? Well, that's correct. That's what they said. That's what the arresting officers saw. I don't disagree with that. But they testified that the basis for the actual stop was that they had identified these two individuals. And that identification is necessary for us when we look at the matrix of articulable suspicion. When you say identified, nobody said, we're looking for John Jones. That's correct. But according to the arresting officers, Deputy Miller described two individuals, I should say, not identified. The district judge said, this is his opinion, Deputy Miller next testified and stated that he had no recollection of either making or not making a radio communication on January 9, 2013. He testified that it, quote, wouldn't be uncommon for him to give that information as a reflex, end quote. Are you saying that at some other point he denied having made the communication? You're correct, Your Honor. He indicated he had no recollection of it, but he also indicated that he had never seen the defendant before. Now, this is where I was going. When the district judge asked him, the district judge queried him and said, so do you have any recollection of making this radio transmission? He said, no, I don't. He said, do you remember making any radio transmission or seeing anybody? He said, no, I don't remember that. And the judge said, have you ever seen these? He said, I don't know if it was counsel or the judge. They asked him, have you ever seen this defendant? He said, no. Nobody talks about that there's an identification, an equivalence of persons. It's not like you go to a house and they say, oh, I was robbed by a man six feet tall looking like this, where it's important what they look like. He never, even if you credit the nonexistent transmission, he didn't give a description. At most, they said there are two guys, one of them with a mask or a bandana. There's nothing contradictory about saying, I've never seen this person because he wasn't identifying him by his face, was he? He didn't identify him by his face. But if we accept the testimony of the arresting officers, the basis that they articulated for why they stopped my client was because they heard a radio transmission of two individuals that were walking near the scene of this shooting, one of whom was wearing a bandana. And if that's not true, then we have nothing else that ties the two individuals to the arrest. Even if you have nothing that, and I'm not conceding this, but even if you had nothing to tie them to the arrest, given the officer's investigation in a scene where shots have just been fired, isn't it, I guess under the inevitable discovery doctrine, isn't it reasonable that with these individuals that close to the crime that officers would question people who are in the vicinity or near the crime and inevitably talk to these individuals and come to the same point? Well, Your Honor, I think that your question basically goes to what the court, this court has described as context-based factors. You just have two individuals who are walking near an apartment complex and we don't have any other... Where shooting has, where shots have just been fired. Where shots have been fired. You have two individuals. This is at 6.50, 7 o'clock p.m. So it's not, this isn't in the middle of the night. But there was nothing that connected my client with the crime scene. There was nothing that connected him to any suspicion. The arresting officers testified they didn't see him do anything out of the ordinary. He wasn't running. He didn't reach for a weapon. They testified to that. So what we're just left with is that they stopped this individual who was walking near this apartment complex. And then they said, well... With a bandana over his head. Well, my client didn't have a bandana over his head. No, but the other guy did. They stopped them collectively. That's correct. There was another individual walking who was not, happened to not be with my client. They were both just walking on the same street. There's dispute in the testimony about how far they were apart. But we know that they were some distance apart. They weren't walking side by side in the instance of, like, conversing or having a, walking with a companion. They were far enough apart where they weren't, they didn't appear to be walking together. And my client didn't have anything covering his face. What's the basis of that of, quote, don't appear to be walking together? Well, because if the other individual had a bandana covering his face, and this is the middle... What's the test, what's the exact testimony that you're relying on to say that they weren't, quote, walking together? Well, Mr. Collins testified. Mr. Sean Collins testified. That was the individual who had the bandana on his face. But the significance of that is... Well, if that's what he says, what did the officers say? Well, the officers said they were closer, but both of, between the officers... But to choose that testimony... But even both, the testimony on both sides was that they were some distance apart. Whether it was 10 to 15 or 40 feet apart, they were some distance apart, even if you look at both of the testimony from both officers. But what's important is that the district court relied on that finding of fact, which was incorrect. Sorry, that finding meaning... The finding of the radio dispatch. Let me go back to that, because as I understood it, and correct me if I'm wrong, Reese and Hoffman, who were the two people who make the actual stop and then the ultimate arrest, they say they got a radio dispatch. So if one set of people say they got a dispatch and another guy says he doesn't remember, maybe he did, maybe he didn't, isn't that the kind of credibility determination that the district judge is entitled to make? Now, I don't recall that there were logs of some sort about calls here. If there were what were known to be generally business record logs and they showed no call of any sort was made, then you might have a case, but if it's the... We do have that. All right, what... We do have those contemporary records. But, Your Honor, to answer your question, the Supreme Court specifically addressed your point in United States v. Gypsum, and they said where testimony is in conflict with contemporaneous documents, we can give it little weight, particularly when the crucial issues involve the mixed question of law and fact. This is the Supreme Court's decision in United States v. Gypsum. That's not a suppression, I don't think, if it's the U.S. Gypsum. Well, it wasn't a suppression, but that is where we find the genesis of the clearly erroneous standard of fact. Tell me, what is it that you say that the contemporaneous documents, because that would seem much stronger than... The 911 police reports. There's two agencies that recorded contemporaneously the police, the recordings of the dispatches. Both of those documents show that there was no radio dispatch, and both of those documents showed that Officer Miller arrived after the arresting officer, so he couldn't have made the radio dispatch. And those were in evidence. Those are cited in my brief. And that's what the district court cited to, and he's just wrong. Those contemporaneous documents disprove the finding of fact. Okay. You'll have your time for rebuttal. Thank you, Your Honors. May it please the Court. Chris Rossthorne for the United States of America. I just want to address, there was reasonable suspicion for this stop. I'd like to address a few things that were raised by the appellant. Both Deputy Hoffman and Sergeant Reese, and I'm looking specifically at document 20, page ID 53, for Sergeant Reese's portion, stated that they were walking right next to each other in the same direction. So both of the officers were consistent in their testimony that these two there was the one person who was testifying, giving them some distance apart, Sean Collins. The first district court who heard his testimony did not credit it and referred to it as internally inconsistent based upon the discrepancies within Mr. Collins' testimony. With regard to the statement regarding Deputy Miller's testimony and that he denied making the specific radio transmission, that I don't think is a completely accurate recitation of his testimony. What Deputy Miller testified to specifically, and in the trial he was called by the defense, and in the suppression hearing he was called by the government, what he testified to both cases was a lack of memory. In the trial he specifically said it was due to the number of calls that he responds to. Unfortunately, I think twice, both in the suppression hearing and in the trial, he spoke of the number of both because he acts as a paramedic and a sheriff's deputy, the number of shootings and stabbings that he responds to, which didn't provide him with a particularized memory of this date. But if we accept the characterization of the testimony given by appellant's counsel, wouldn't that make Officer Miller's testimony internally inconsistent and otherwise? Well, what Deputy Miller specifically said was, and the question was, in this case you have no memory of not doing it or making the call, and you have no memory of making the call, you just don't remember that particular call. And he says, I just don't remember the specific call. Deputy Miller, Sergeant Reese, and Deputy Hoffman made the arrest, and with the call I'm talking about the response to the actual shooting. Okay, now Mr. Rothstone says that Officer Miller arrived after the arresting officers, and so it would have been impossible for him to have put out the dispatch. What do you say about that? Well, there's two separate issues with that. The first is that unfortunately because of turnover in the City of Flint and for other reasons that aren't explained as far as the Genesee County dispatch, in the Genesee County there's three different 911 dispatch systems. There's the Fenton, which is a suburb of Genesee County, which wasn't at issue in this case, the City of Flint, and Genesee County. They run off two computer-aided dispatch systems, both of which separately keep records. In this case, neither radio transmission was kept, and so we're left with the rote times that are written on there. We know that Deputy Miller was the first person to be called to respond. We also know that when Deputy Miller made the transmission a few minutes later of being at the scene, that it was a different location from which he would be speaking of from when he passed the two individuals. So certainly it's not entirely inconsistent with that occurring. So it's certainly possible that that occurred, and moreover the— It sounds like you're not really addressing the time difference. As I understood it, there is a record query by somebody. That is, is it a notation by a dispatcher of 554? Is that an electronic record, or is that a notation by a dispatcher? I'm not entirely sure. I believe it's an electronic record, but essentially I guess the time difference could be made up for the fact that we're talking about two separate locations, the location at which these two individuals were observed and the location at which he ultimately arrives to the location of the shooting, or I'm not sure if it's where he begins to make a transmission that he's actually tending to the shooting victim, or if he's located the shooting victim. This apartment building, the Regency Apartments, has essentially one entrance by motor vehicle, and it's— So Miller, by the government's account, sees these two guys, but he's on his way to the shooting victim, right? Correct. And at some point he tends to the shooting victim, and at some point he makes a transmission, arguably not necessarily the instant that he sees the two people. Yes. Well, with regard to the transmission that he's arrived on the scene, the later transmission, and that's why it would not be entirely— You say at the scene. That's when he's at the victim, not when he passes the people. Yes. That would be my— Because that's your argument. Yes. And I think the— And the source of when the two officers confront the man, what's the source of that time? Is that their transmission? That's also from the dispatch reports is the result of that. And there might be, between the two dispatch reports, some difference in time because they're running on two different systems. So the Miller is responding to one system, and the two officers, Reese and Hoffman, are responding to a different system? I believe they're both on both different systems, that there's records coming in on both. The dispatch reports are not entirely clear, and there's some testimony with regard to the— The dispatch report, as far as the officers identified as stopping the individual with the firearm were identified within the dispatch as Flint City officers rather than what they actually were, which was Michigan State Police report, Michigan State Police officers. It's not a huge difference, but I think in an unfolding situation, this is not a verbatim transcript of what occurs. So there's the testimony of the district court choosing to— So there's not tapes of the dispatchers? The tapes were not—there was not a tape in this circumstance of the radio back and forth. So there's some summary of it, but there's not a complete transcript. The district court's decision to credit the testimony of Sergeant Reese and Trooper Hoffman over the dispatch report was not clearly erroneous based on all of those facts. And I guess when I say the district court, I should say both district courts since the defendant renewed the motion to suppress at the end of the trial in front of Judge Berg. So both district courts, in ruling on the motion to suppress, came to the same decision. And Judge Berg based it not only on the trial testimony but also on reading— Well, Reese and Hoffman, the fact that there was a shooting, that shots had been heard in this vicinity, did that come only from Miller's—allegedly from Miller's dispatch? No, they were responding, Miller was dispatched to the scene of the shooting and they were also dispatched to the same scene of the same shooting. Because who had reported the shooting? That is not—that's not clear. Okay, but at least I'll ask your adversary, is it clear that Reese and Hoffman knew that there was a shooting in this vicinity whether or not they heard Miller's call? Yes, that's entirely clear. They were—the record is of them, both in their testimony, was that they were responding to this, that they were sent off to the shooting by the central dispatch, that it was a report of a shooting of an individual, and that upon their way to the shooting, they heard the dispatch from Deputy Miller. While on their way to that, within a quarter mile of the reported location of the shooting, they saw two individuals after receiving this report from Deputy Miller, one of whom was wearing a bandana over his face, that it was—it wasn't the middle of the night, but since this was a January occurrence, it was dark, and beyond that, there was—that it was dark, and they were the only two individuals on the street, one of whom was wearing a bandana, and this obviously occurs less than five minutes. Miller allegedly did not tell them anything that they did not see with their own eyes other than the same thing might have been there two, three minutes earlier. The only difference would be is that they may have been closer— closer to the actual shooting scene when Miller observed them, but regardless, they saw, within five minutes of this reported shooting, two individuals being the only individuals walking on the street, one of whom was wearing a bandana covering his face. So there was reasonable—there was reasonable suspicion based on those facts, and I don't think that—and Deputy Miller's testimony does not— it's just a lack of memory as to— Am I right? As you said, this was winter. These events happened on January 9th. They weren't indicted, I think, until July. Do you know when the actual suppression hearing was held? I believe that the suppression hearing was held in December. So it's basically nearly a year after the events in terms of what Miller remembers or doesn't remember. Yes, and with Deputy Miller, we're talking about that long time afterwards, and with his role, once he got to the scene, being that of a paramedic rather than an officer, he wasn't involved in the drafting of any reports and would have less to go off of than Sergeant Reese and— So he didn't make any contemporaneous recording of this whole event at all. He was off trying to save the victim. Yes, that is correct. Okay, go ahead. And so overall, I think when comparing— looking at this court's prior decisions in McMullen as well as that in Houston v. Clark County Sheriff's Deputy John Doe's, this would allow—the district court's decision in this case would align with those, and especially under the clearly erroneous standard. The evidence is—there is evidence in terms of Deputy Hoffman and Sergeant Reese's testimony to support Deputy Miller's— to support the fact that Deputy Miller made such a transmission, and even without Deputy Miller making such a transmission, there's reasonable suspicion to stop these individuals for involvement in that shooting. Let's assume that we—that you're right on the suspicions of a stop and all of that. I want to go ultimately to the sentencing enhancement, which is a part of the record also, the enhancement for the stolen weapon. Tell me about the justification for that. The facts support— I understood that Mr. Chambers and his girlfriend were living together. It was her gun. He took the gun. She said that she didn't give him permission to take it. Is that right? Yes, that is correct. And it's a fact that while Mr. Chambers objected to the application of the sentencing enhancement, he didn't object to that particular fact, as you recited in the PSR, and more specifically, Mr. Chambers admitted to the same in his sentencing memorandum. And in United States v. Jackson, that's 401F3D747, that involved the application of the sentencing enhancement for stolen firearm for an individual who took his father's firearm in order to commit suicide. And in that particular case, while overruling on other grounds, this court upheld the application of the sentencing enhancement because looking at the definition of to steal as to take without permission, it upheld it in that particular circumstance. I understand that plain language definition, but it seems to me that that is a very broad and sweeping definition that can sweep a lot of otherwise innocent conduct under there. I understand that he may not have had permission, but is there any indication that he took the weapon with the intention of depriving the owner of that for all times, which is more what we generally think about than plain language of stealing. The plain language of stealing that the court went off of in Jackson obviously didn't include that. But there is no evidence as to what Mr. Chambers was going to do with the firearm when he took his girlfriend's firearm without permission on that date and took her extra magazine as well. So I don't know. I'm not sure why he took her firearm loaded with all of its loaded and then also took the extra magazine as well. I'm not sure if that would lend more toward him doing something permanently depriving or if he felt the need for more ammunition. But we don't know what he ultimately intended to do with the firearm on that day. What we do know is that it was taken without her permission based on his apology to her at the scene after he was caught with it, her statements that he took it without permission. And I don't think there's... It was locked up somewhere, wasn't it? It wasn't like it was lying around the house between the two of them. I thought it was locked away. Yeah, I believe that she had stated that she may have been... She stated that he had somehow been able to access the key. Anything else, colleagues? No, thank you. Your Honors, I want to return to the point that Your Honors asked about these electronic recordings, the electronic entries. And as my brother counsel indicated, these were electronic entries. And I want to make clear there were two different contemporaneous records. We're not talking about one. We're talking about two different contemporaneous records. One was the City of Flint's dispatch. The other was the Genesee County dispatch. And both of those contemporaneous electronic entries show that Officer Miller arrived after and that he didn't make any radio dispatch about these individuals or anyone walking or anyone with a bandana. Just to be clear, the defense called the dispatch, the woman who ran the county dispatch, Carol Jensen, to testify. And this is what she said. She said, okay, and so both the city and the county records indicate that two people, apparently at least one of them with a bandana, were stopped before Officer Miller arrived. Is that correct? And she said, correct. And then the question, is there any indication in either of those records, two independent records, that Officer Miller was on the scene and gave a description of anybody prior to his arrival at the scene? No, I don't see anything in there. Is it fair to say that? We agree that these are not tapes, right? They're not tapes, but they're electronic entries. Well, but the electronic entry is at best when he says something. So the statement, quote, arrived at the scene, that's a characterization. That's addressed. I'll just finish the next question. The question was, is it fair to say that in terms of both of the chronologies, that there's no indication after the 6.50 p.m. dispatch that Deputy Miller made a radio dispatch which included this description? Correct. So neither one of them. Yet if it's not a transcript, whatever he said, whatever he might have said would not necessarily have appeared. But there's no entry of it. It's not about when, if he made it, whether he saw these people then passed the scene and made a recording. You said 6.50. I had seen something here talking about 5.54. No, Your Honor, this was 6.50. This was all 6.50 to 6.55. These are when these entries were in the electronic recordings. But the point was both of these contemporaneous documents show that Miller never made a dispatch. Never made a dispatch. Never made a dispatch. You have a time when he made a dispatch. That's what you're relying on, right, that it's afterwards? No, the chronologies only show that he responded to the dispatch of the shooting, he went to the scene, and then he arrived. The other officers said that they arrived and they identified the bandit. But when you say there's no dispatch, there's nothing. Miller did say something because they had to know he arrived at the scene. No, they didn't know that. They didn't know Miller arrived. Miller made no electronic communication of any sort. Not according to the contemporaneous records of two different jurisdictions. He made no dispatch about seeing two individuals. No, but not about seeing them because we... Stick with me, come on. Miller is in some way connected to the electronic system because you keep saying he did not arrive until afterwards. That's right. So there is something, which is the afterwards. Okay? That's right. And that's when he is at the victim, correct? That's correct. Okay, so he does have something that he's there. Right, but the testimony is that they, the testimony of the arresting officers was that Miller described these two individuals, one with a bandana. There's nothing in these two different contemporaneous records on that point. Go back to the beginning. Did the officers who stopped your client, did they know of the shooting, that there was a shooting? Yes. Both the arresting officers and Miller, they all knew of the shooting. Just a minute. Did they see these two guys walking in close proximity? Well, the government... Did they see these two guys walking in close proximity? A quarter mile from the shooting, and that is a very important and distinguishing factor when you look at the fact that it was a quarter mile from the shooting. And when they saw them, that was within a couple of minutes of the shooting. Is that correct? That's correct. But that doesn't tie these individuals at all. Were they one of the people walking, Collins, wearing a mask? That's correct. And were the events that occurred, did they occur in a high crime district? That's correct. And you're saying that's not enough because they must have relied on Miller to have identified two people. Well, that was their testimony that they relied on Miller. And we're looking at what they articulated. They have to articulate their basis. Let's just take either version of the facts. Are the facts that I just laid out for you, you're saying are those insufficient? I believe those facts are insufficient. Those are context-based factors. This court in Johnson said context-based factors can lead to inferences of racial profiling and socioeconomic differences. Those are context-based. Two individuals walking a quarter of a mile from a shooting. That's all. What is context-based factors? How does that differ from evidence or factors of you articulate something? What are non-context-based factors? Well, that's this court's opinion in Johnson. I'm just asking you. Sometimes we say things that have interesting repetition. Non-context would be that this individual is right outside the shooting or he has blood on his hands or he has a gun in his hand or he's running. Those are non-context-based factors. So the bandana is non-context-based. The shooting is non-context-based. No, the shooting was the reason they were all responding to the scene. Is that context-based or non-context-based? That would be context-based. But saying that it's a high crime area, that's a context-based factor. I'm sorry, you just said the shooting was context-based. Is that what you meant? The shooting was the reason they were responding. No, but I just ask you, in your opinion, is the shooting a context-based factor? I believe it's context, because that's why the officers were going there. But having individuals a quarter of a mile from there walking in an apartment complex. Okay, I hear you. Anything else, colleagues? No, thank you. Mr. Desi, thank you for taking this case under the Criminal Justice Act. It is a service to our system of justice, and I imagine we're not compensating you at your usual rates. We appreciate your doing it. That case will be submitted.